UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


SANDRA RHODEN                                          PLAINTIFF


VS.                               CIVIL ACTION NO. 3:08CV473TSL-JCS


UNIVERSITY OF MISSISSIPPI
MEDICAL CENTER                                         DEFENDANT


MEMORANDUM OPINION AND ORDER


This cause is before the court on the motion of defendant
University of Mississippi Medical Center (UMMC) for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure.  Plaintiff Sandra Rhoden has responded to the motion
and the court, having considered the memoranda of authorities,
together with attachments, submitted by the parties, concludes
that the motion should be granted.

In April 2006, plaintiff was hired by UMMC as an Assistant
Professor in the Department of Radiology and assigned to work in
the Division of Breast Imaging under the direction and supervision
of the Division's Section Chief, Amy Coleman.  In August 2007,
plaintiff was terminated--or given the option to resign or be
terminated--allegedly because of deficiencies in her job
performance.  Following her termination, plaintiff filed a charge
of discrimination, claiming she was terminated because of her age,
and she subsequently filed the present action under the Age

Discrimination in Employment Act (ADEA), 29 U.S.C. § 623, alleging she was terminated from her employment with UMMC on account of her age.[1]  See 29 U.S.C. § 623 ("It shall be unlawful for an employer (1) to fail or refuse to hire or to discharge an individual or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.").

A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence.  Where, as here, the plaintiff lacks direct evidence of discriminatory intent, the plaintiff's proof by way of circumstantial evidence is evaluated under the McDonnell Douglas framework:  "First, the plaintiff must establish a prima facie case of discrimination."  Russell v. McKinney Hosp. Venture, 235 F.3d 219, 222 (5th Cir. 2000) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000)); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)).  Second, the employer must articulate a legitimate, nondiscriminatory reason for its decision.  Russell, 235 F.3d at 222 (citing McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1817).  Third, if the employer carries its burden, the "mandatory

_____

[1]     Plaintiff also asserted federal claims for gender discrimination, retaliation and hostile work environment, and state law claims for breach of contract, intentional infliction of emotional distress and defamation.  In response to UMMC's motion, plaintiff conceded all of these claims.

inference of discrimination" created by the plaintiff's prima facie case "drops out of the picture" and the fact finder must "decide the ultimate question: whether [the] plaintiff has proven [intentional discrimination]. Id. (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 n.10, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), and St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511-12, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).

To establish a prima facie case of age discrimination, a plaintiff must show that "(1) [s]he was a member of a protected class-those persons over the age of forty; (2) [s]he was qualified for the position that [s]he held; (3) [s]he suffered an adverse employment action; and (4) [s]he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of [her] age." Berquist v. Washington Mut. Bank, 500 F.3d 344, 349 (5th Cir. 2007) (citing Rachid v. Jack In The Box, Inc., 376 F.3d 305, 309 (5th Cir. 2004)). In the present action, it is undisputed that plaintiff was within the protected class. Moreover, while UMMC denies that plaintiff was discharged and hence denies that she suffered an adverse employment action, the record evidence establishes without dispute that plaintiff was given only two choices: she could resign or she could be fired. Based on these facts, plaintiff can establish she was constructively discharged. See David v. Pointe Coupee Parish School Bd., No. 00-30342, 2001 WL 43530, at 2 (5th

Cir. Jan. 4, 2001) ("[A]n employee can prove constructive discharge with evidence that she was given an ultimatum requiring her to choose between resignation and termination.") (citing Faruki v. Parsons S.I.P., Inc., 123 F.3d 315, 319 (5th Cir. 1997)). Plaintiff can also establish, at least for purposes of establishing a prima facie case, that she was qualified for her position. Although UMMC asserts that plaintiff was terminated, in part, because of deficiencies in her job performance, the Fifth Circuit has held that "performance concerns are more appropriately addressed in assessing a plaintiff's assertion that an employer's articulated reason for its action was a pretext." Taylor v. Peerless Indus., Inc., 322 Fed. Appx. 355, 357, 2009 WL 837326, 1 n.1 (5th Cir. 2009). See Berquist v. Wash. Mut. Bank, 500 F.3d 344, 350-51 (5th Cir. 2007) ("Although Washington Mutual submitted evidence that Berquist's supervisors were not pleased with his performance, this evidence does not prove a lack of qualifications at the prima facie stage."); Bienkowski v. Am. Airlines, Inc., 851 F.2d 1503, 1506 (5th Cir. 1988) ("[A] plaintiff challenging his termination or demotion can ordinarily establish a prima facie case of age discrimination by showing that he continued to possess the necessary qualifications for his job at the time of the adverse action. The lines of battle may then be drawn over the employer's articulated reason for its action and whether that reason is a pretext for age discrimination.").

As to the final element of her prima facie case, in the court's opinion, plaintiff cannot establish that she was replaced by someone younger or by someone outside the protected class. Plaintiff takes the position that she was "replaced" by Dr. Heather Bracey and two board certified radiologists, all of whom were younger than plaintiff and outside of the protected class. However, it is undisputed that no one was hired to replace plaintiff or placed in her position. Rather, her workload was shifted among existing employees. See Pilcher v. Continental Electronics Corp., No. 96-11130, 1997 WL 450078, 4 (5th Cir. July 8, 1997) ("A person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.").

Since plaintiff cannot establish that she was replaced by someone outside the protected class or someone younger, then to prove her prima facie case, she must demonstrate that she was otherwise discharged because of her age. The Fifth Circuit has held that "evidence of disparate treatment may ... logically suggest a discriminatory motive for purposes of establishing a prima facie case of age discrimination." Machinchick v. PB Power, Inc., 398 F.3d 345, 353 n.26 (5th Cir. 2005). Here, plaintiff has

not attempted to identify any other similarly situated employee was treated more favorably.[2]  Instead, she has attempted to satisfy this element with proof that her Section Chief, Dr. Amy Coleman, was biased against plaintiff because of plaintiff's age and that Dr. Coleman falsely claimed that she had personally observed deficiencies in plaintiff's job performance in order to have plaintiff removed from the breast imaging rotation.  As evidence of Dr. Coleman's alleged age bias, plaintiff has claimed that Dr. Coleman, in direct conversation with plaintiff, called plaintiff "old school" and suggested that plaintiff "had not kept up" in the area of breast health.  Cf. Machinchick, 398 F.3d at 353-354 (evidence that supervisor asked plaintiff when he planned on retiring "although potentially innocuous, constitutes some evidence giving rise to an inference of discriminatory motivation behind [the plaintiff's] termination" to satisfy the plaintiff's prima facie case).  And, she claims that this age bias led Dr. Coleman not only to recommend to Dr. Mike Doherty, Interim Chair of the Radiology Department, in March 2006 that plaintiff be removed from the breast imaging rotation because of alleged concerns regarding her clinical competence, but to misrepresent in

---

[2]     As one of the bases for its motion, UMMC contended plaintiff could not establish her prima facie case because she could not identify any similarly situated employee outside the protected class who was treated more favorably under nearly identical circumstance; it argued she has no evidence that any younger non-tenured Associate Professor failed to perform his or her job satisfactorily and yet was not discharged.  In her response, plaintiff has not contended otherwise.

support of that recommendation that she, Dr. Coleman, had personally observed plaintiff's work during the week of March 6 to March 10, 2007 and formed the opinion that Dr. Rhoden did not provide an acceptable quality of work.  According to plaintiff, the evidence establishes beyond question that Dr. Coleman could not possibly have personally observed plaintiff's work during the week of March 6 to 10, 2007 since plaintiff was attending a conference out of state that week.  Plaintiff reasons that since the evidence establishes that Dr. Coleman's claimed basis for seeking plaintiff's removal from the breast imaging rotation, i.e., her alleged personal observation of plaintiff's work, is patently false, then a jury could reasonably infer that Dr. Coleman's true motivation was age bias, particularly in light of Dr. Coleman's characterization of plaintiff as "old school" and as not "keeping up."  Plaintiff maintains that this evidence of Dr. Coleman's age bias is sufficient both to satisfy her prima facie case, and to create an issue for trial on whether UMMC's articulated legitimate nondiscriminatory reason for plaintiff's termination, i.e., performance issues, is pretextual.

It is undisputed that the decision to terminate plaintiff was made not made by Dr. Coleman, but rather by Dr. Timothy McCowan, Chairman of the Department of Radiology.  Notwithstanding this, plaintiff contends the evidence clearly shows that Dr. Coleman's complaints and criticisms of plaintiff led to plaintiff's removal

from the biopsy rotation, and ultimately to Dr. McCowan's decision to terminate plaintiff's employment (or "ask for her resignation"). Plaintiff maintains that she has shown that there exists a genuine issue of material fact as to whether or not Dr. McCowan's adverse employment decisions were made based on reliance on Dr. Coleman's age-biased criticisms and recommendations. In taking this position, plaintiff relies on a "cat's paw" theory, contending that Dr. Coleman caused her termination by falsely reporting, first to Dr. Doherty and ultimately to Dr. McCowan, that based on her personal observations, plaintiff lacked the necessary skills to properly perform her job.

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Reeves, 530 U.S. at 152, 120 S. Ct. at 2111. To establish such an intent to discriminate on the part of the employer, a plaintiff must produce sufficient evidence that would support a finding that "the protected trait ... actually motivated the employer's decision." Id. at 141, 120 S. Ct. at 2105. The protected trait "must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." Id., 120 S. Ct. at 2105 (internal quotation marks and alterations omitted). In determining whether an adverse employment action was taken as a result of discrimination, the focus is on the final decisionmaker;

the actions of individuals who did not make the challenged decision are typically not actionable.  See Leach v. Baylor College of Medicine, Civ. Action No. H-07-0921, 2009 WL 385450, 29 (S.D. Tex. Feb. 17, 2009).  However, "[c]ourts do not 'blindly accept the titular decisionmaker as the true decision-maker,'" Laxton v. Gap Inc., 333 F.3d 572, 584 (5th Cir. 2003) (quoting Russell, 235 F.3d at 227); "[r]ather, "the discriminatory animus of a manager can be imputed to the ultimate decisionmaker if the decisionmaker 'acted as a rubber stamp, or the "cat's paw," for the subordinate employee's prejudice,'" id. (citing Russell).  The Fifth Circuit has thus held that "[i]f an employee can demonstrate that others had influence or leverage over the official decisionmaker, and thus were not ordinary coworkers, it is proper to impute their discriminatory attitudes to the formal decisionmaker .... 'If the [formal decisionmakers] acted as the conduit of [the employee's] prejudice-his cat's paw-the innocence of the [decisionmakers] would not spare the company from liability.'"  Bryant v. Compass Group USA Inc., 413 F.3d 471, 477 (5th Cir. 2005) (quoting Russell, 235 F.3d at 226-27).

"To invoke the cat's paw analysis, [the employee] must submit evidence sufficient to establish two conditions: (1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker 'possessed leverage, or exerted influence, over the

titular decisionmaker.'" <u>Roberson v. Alltel Info. Servs.</u>, 373 F.3d 647, 653 (5th Cir. 2004) (quoting <u>Russell</u>, 235 F.3d at 227).

In its briefing in response to plaintiff's assertion of a "cat's paw" theory, UMMC does not explicitly concede that plaintiff has created a triable issue on alleged age bias by Dr. Coleman; it does not address that issue at all. Instead, it confines its rebuttal to the second condition, arguing that plaintiff cannot rely on a cat's paw analysis since Dr. McCowan's decision to discharge plaintiff (or request her resignation) followed his own independent investigation of problems in the Breast Imaging Division. The record evidence, even when viewed on the light most favorable to plaintiff, confirms that Dr. McCowan's decision to terminate plaintiff's employment was his own decision, following his own independent investigation, and that Dr. Coleman did not have the requisite influence over his decision to support plaintiff's cat's paw theory. <u>Cf.</u> <u>Wallace v. Methodist Hosp. Sys.</u>, 271 F.3d 212, 222 (5th Cir.), <u>cert. denied</u>, 535 U.S. 1078, 122 S. Ct. 1961, 152 L. Ed. 2d 1022 (2002)(rejecting cat's paw theory where final decisionmakers did not rely on the discriminatory supervisor's factfinding to terminate the plaintiff because the plaintiff admitted to the final decisionmakers that she committed the violation for which they fired her); <u>Ameen v. Merck & Co., Inc.</u>, 226 Fed. Appx. 363, 377, 2007 WL 1026412, 10 (5th Cir. 2007) (even if supervisor recommended the plaintiff's

termination, the final decisionmaker "cannot be said to have acted on that recommendation, given [the plaintiff's] direct admission of her misconduct to [the decisionmaker]")(citing <u>Wallace</u>); <u>Evans v. Texas Dept. of Transp.</u>, 547 F. Supp. 2d 626, 656 (E.D. Tex. 2007) (noting that "if the decision maker conducted an independent investigation rather than 'rubber stamping' or relying on the recommendation of the person with retaliatory animus, any causal link between the alleged retaliatory intent and the adverse employment action is severed").

In this regard, the record establishes that Dr. McCowan was hired to head UMMC's Radiology Department effective July 1, 2007, around six weeks before he requested plaintiff's resignation. Dr. McCowan recalled that prior to accepting the position, he was made aware by Dr. Doherty, Interim Department Chairman, that there were "some issues" in the mammography department, in particular with regard to Dr. Rhoden, that would potentially need attention or investigation once Dr. McCowan was installed as chairman. He recalled that these issues were about "disruptive behavior, lack of cooperation, clinical skill set, potentially patient safety related to Dr. Rhoden." Dr. McCowan explained that in early July 2007, shortly after assuming his position with UMMC, he began to investigate the situation in the Breast Imaging Division. He met with Dr. Coleman, who raised questions relating to Dr. Rhoden's clinical competence and disruptive behavior. He spoke with Dr.

Doherty, who was familiar with problems in the department, and he spoke with Dr. Rhoden, as well. He also spoke with Dr. Heather Bracey, who had been a fellow in the Breast Imaging Division working under Dr. Coleman and who was hired as an Associate Professor in the department effective July 1, 2007. And he spoke with the technologists in the department, and with Wayne Franklin, Director of Imaging. On August 17, Dr. McCowan met with Dr. Coleman, plaintiff and Dr. Bracey to discuss what he has described as significant issues and problems which had become apparent to him during his investigation. In a memorandum recounting the meeting, Dr. McCowan identified "two major problems with the Breast Imaging Service" relating to plaintiff's performance. "The first was her professional relationship with the other physicians, the support staff such as technologists and nurses, and also with the administrative personnel dealing with breast and medical imaging, predominantly at the Pavilion."[3] Dr. McCowan related that there had been numerous complaints about plaintiff, not just from the technologists in her area, all of whom had expressed they were extremely dissatisfied with her interaction with them, but from "all of these areas of personnel," including other support staff and physicians in the department. Dr. McCowan related in the meeting of August 17, Dr. Rhoden was reluctant to admit this

_____

[3]     The record establishes that the Breast Imaging Division operated at two locations, at the Jackson Medical Mall and at the UMMC Pavilion. Drs. Coleman and Bracey worked at the Medical Mall and plaintiff worked exclusively at the Pavilion.

was a problem or to admit any responsibility for the problem. The second major area of concern related to plaintiff's performance of invasive procedures on breast patients, such as biopsies and needle localization. Dr. McCowan related that in addition to concerns that had been raised by Dr. Coleman, "[v]ery significant concerns were submitted by numerous technologists working in [plaintiff's] area." In addition, statistical data provided by Dr. Coleman had indicated a marked discrepancy in the positive biopsy rate of Dr. Rhoden as compared to the remainder of the Breast Imaging Division and to national standards. Dr. McCowan thus concluded that plaintiff should be taken off any invasive breast procedures indefinitely. Dissatisfied with Dr. McCowan's decision, plaintiff requested an immediate leave of absence.

A few days later, at plaintiff's request, Dr. McCowan met with her individually and discussed with her in detail some of the same issues that had been previously discussed, most notably her professional interaction and the "severe quality question" regarding her invasive procedures. According to Dr. McCowan's memo of the meeting, plaintiff expressed "no understanding of the concept that she could be part of the problem but instead, blamed the situation again on the technologists, support personnel, and the situation in which she found herself working at the Pavilion." Of plaintiff's response, Dr. McCowan wrote: "I must say, that despite very specific and pointed examples of problems with either

her conduct, professionalism, or technical skills, she refused to take virtually **any** responsibility or acceptance of her role in the problems presented." Plaintiff was not terminated at that time, but remained on leave, with plans to return to work the following Monday. However, Dr. McCowan learned the following day that plaintiff had gone to the Pavilion while on leave and left with a logbook of procedures she had performed at the Pavilion, which Dr. McCowan believed belonged to UMMC. Dr. McCowan indicated that by that time, it had become apparent to him that the problems with plaintiff were not solvable and that she was not suitable for continued employment at UMMC. In his deposition, he explained that "in the midst of the events following and relating to these meetings, all of the information I had gathered related to this, some actions of Dr. Rhoden took immediately following these (meetings)," he concluded that he did not think Dr. Rhoden "would be an appropriate faculty member to continue, and that we needed to have some sort of resolution that either she would need to be terminated or she would need to resign."

Although plaintiff contends that the decision to terminate her can be traced to Dr. Coleman, Dr. McCowan made it very clear throughout his testimony that he made the decision to terminate plaintiff's employment based on his own investigation; as he put it, he "didn't just take Dr. Coleman's word for it." He "checked with other key faculty members such as Dr. Doherty, Dr. Bracey,

the director of imaging, the technologists in the mammography area.  People that would have experience and knowledge of what some of the issues would be."[4]  According to Dr. McCowan, his conclusion that she was "disruptive, uncooperative, insubordinate, ha[d] questionable clinical skills and would not be of benefit to be in that section or at the University" was "[b]ased on a multitude of things related to these meetings, other input from, again, the physicians, some of the physicians I mentioned, such as Dr. Doherty, Dr. Bracey, Dr. Coleman, the technologists, the director of imaging."

From the foregoing, the court concludes that the record does not reasonably support a finding that there exists a genuine issue of material fact on plaintiff's assertion of a cat's paw theory of liability against UMMC.  It follows that plaintiff cannot prevail, as she lacks evidence from which it could reasonably be inferred that the ultimate decisionmaker, Dr. McCowan, made the decision to

---

[4]    Although plaintiff now suggests that Dr. Coleman was the driving force behind her termination, in an August 26, 2007 email she sent to Paul Trussell in UMMC's Human Resources Department asking for his assistance, plaintiff wrote that the complaints which caused Dr. McCowan to remove her from breast interventional procedures "appear to have originated with the technical staff and Dr. Coleman and the Senoryx vendors," but that "t*he main area of complaint seems to have come from the technical staff.../technical administrative staff ... in the Pavilion* with whom I have worked." (Emphasis added).  Plaintiff went on in the email to criticize and condemn the technologists, along with Dr. Coleman, Wayne Franklin (Director of Imaging), and the equipment vendor Senoryx's sales personnel, and to suggest that "[Dr. Coleman] and the techs and the Seonryx vendor [had] banded against [her] and planned to take her out of the interventional (rotation) ...."

terminate plaintiff because of her age.  Plaintiff thus cannot make out her prima facie case, and cannot show that his decision was pretext for unlawful discrimination.  Therefore, UMMC's motion for summary judgment will be granted.

Based on the foregoing, it is ordered that UMMC's motion for summary judgment is granted.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED this 15th day of September, 2009.


/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE